**E-FILED**
Tuesday, 09 February, 2016 11:13:53 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| Total Merchant Services, Inc. | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 1:15-cv-1327-JES-JEH |
| | ) | |
| Mark Rhinehart, Erik Nelson, Brad Maloney, | ) | |
| Blu Entertainment Group, LLC, and Country Life | ) | |
| Music Festival, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, TOTAL MERCHANT SERVICES, INC., by and through its counsel, James C. Vlahakis of Hinshaw & Culbertson, LLP, states the following as their Second Amended Complaint against MARK RHINEHART, ERIK NELSON, BRAD MALONEY, BLU ENTERTAINMENT GROUP, LLC, and COUNTRY LIFE MUSIC FESTIVAL, LLC:

## PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Total Merchant Services, Inc. ("TMS") is a Nevada corporation with a principal place of business in Woodland Hills, California.

2.  TMS processes credit card payments for small and medium sized business clients and typically deposits funds electronically into a client's bank account within 48 hours.

3.  MARK RHINEHART ("RHINEHART") is domiciled in Carlock, McLean County, Illinois.

4. ERIK NELSON ("NELSON") is domiciled in Eureka, Woodford County, Illinois.

5. BRAD MALONEY ("MALONEY") is domiciled in Pekin, Tazewell County, Illinois.

6. For the time period of the events set forth in the Complaint (December 2013 through July 2015), BLU ENTERTAINMENT GROUP, LLC ("BLU") was and is an Illinois Limited Liability Company, authorized to do and having done business in Peoria County, Illinois, by and through the sale of concert tickets in relation to the Country Life Music Festival, which was scheduled to take place during July 17-19, 2015, at Three Sisters Park, located in Peoria County, Illinois (the "2015 Country Life Music Festival").

7. For the time period of the events set forth in the Complaint, COUNTRYLIFE MUSIC FESTIVAL, LLC ("COUNTRYLIFE") was an Illinois Limited Liability Company, authorized to do and having done business in Peoria County, Illinois, through the sale of concert tickets.

8. For the time period of the events set forth in the Complaint, and up to the date of the filing of this Complaint, Defendants RHINEHART, NELSON and MALONEY were the sole members of COUNTRYLIFE.

9. Diversity jurisdiction exists by virtue of the fact that TMS's principal place of business located Woodland Hills, California, the corporate Defendants are Illinois based business and the individual Defendants reside in Illinois.

10.    Venue is proper in this District, because the individual Defendants reside in this District, and the various transactions and misconduct which form the basis for the causes of action asserted in this Complaint took place in this District.

## BACKGROUND FACTS

11.    For the time period of the events set forth in the Complaint, Defendants RHINEHART, NELSON and MALONEY were the sole members of BLU.

12.    Defendants RHINEHART and NELSON were identified as the sole members of BLU by the Illinois Secretary of State's website as of August 11, 2015.

13.    For the time period of the events set forth in the Complaint, including the date the 2015 Country Life Music Festival was cancelled; Defendant MALONEY was a member of BLU.

14.    Defendant MALONEY was members of BLU until at least June 13, 2015.

15.    After the 2015 Country Life Music Festival was cancelled, Defendant MALONEY removed himself as a member of BLU.

16.    Additionally, as of the date of the filing of this Complaint, BLU ENTERTAINMENT GROUP, LLC was identified as a Florida Limited Liability Company, with RHINEHART, NELSON and MALONEY as members and officers.

17.    MALONEY was authorized to sign checks on behalf of BLU and did in fact sign a check for BLU in the amount of $200,000 payable to FTTE LLC on or about April 26, 2015.

18.     MALONEY HAS identified himself as being affiliated with "Blu Events & Entertainment" and has also identified himself at the "founder and promotor of the Country Life Music Festival."

19.     MALONEY, on his own and on behalf of BLU, negotiated the terms of contracts for artists who were scheduled to perform at the 2015 Country Life Music Festival.

20.     On at least one contract, MALONEY signed as the VP of Operations for BLU.

21.     In relation to the allegations set forth below, Defendant MALONEY was a member and executive of BLU and was acting on behalf of BLU.

22.     In relation to the allegations set forth below, Defendant RHINEHART was a member and executive of BLU and was acting on behalf of BLU.

23.     In relation to the allegations set forth below, Defendant NELSON was a member and executive of BLU and was acting on behalf of BLU.

24.     As of the date of the filing of this Complaint, Defendants MALONEY, RHINEHART and NELSON were identified as members of COUNTRYLIFE by the Illinois Secretary of State's website.

25.     In relation to the allegations set forth below, Defendant MALONEY was a member and executive of COUNTRYLIFE and was acting on behalf of COUNTRYLIFE.

26.     In relation to the allegations set forth below, Defendant RHINEHART was a member and executive of COUNTRYLIFE and was acting on behalf of COUNTRYLIFE.

27.     In relation to the facts set forth below, Defendant NELSON was a member and executive of COUNTRYLIFE and was acting on behalf of COUNTRYLIFE.

28.     On or about December 17, 2013, BLU, RHINEHART and/or NELSON contracted with TMS to cause TMS to process credit card payments for "music festival ticket sales."

29.     In a signed document, a "Merchant Credit Card Processing Application and Agreement", BLU, RHINEHART and/or NELSON informed TMS that the average ticket price would be $129 and that average monthly ticket sales would be $80,000.

30.     On or about December 17, 2013, RHINEHART and NELSON physically signed the above referenced Merchant Credit Card Processing Application and Agreement as principals and corporate officers of BLU and as guarantors.

31.     On or about December 19, 2013, BLU, RHINEHART and/or NELSON contracted with TMS to cause TMS to process credit card payments for "music festival tickets, CD's T Shirts."

32.     In a signed document, a "Merchant Credit Card Processing Application and Agreement",  BLU, RHINEHART and/or NELSON informed TMS that the average ticket price would be $258 and that average monthly ticket sales would be $45,000.

33.     On or about December 19, 2013, RHINEHART and NELSON physically signed the above referenced Merchant Credit Card Processing Application and Agreement as principals and corporate officers of BLU and as guarantors.

34.     On or about December 09, 2014, COUNTRYLIFE and/or NELSON contracted with TMS to cause TMS to process credit card payments for "music festival ticket sales."

35.     In the signed contrat document, a "Merchant Credit Card Processing Application and Agreement", BLU, RHINEHART and/or NELSON informed TMS that the average ticket price would be $129 and that average monthly ticket sales would be $80,000.

36.     On or about December 9, 2014, NELSON electronically signed the above referenced Merchant Credit Card Processing Application and Agreement as a principal, corporate officer of COUNTRYLIFE and as a guarantor.

37.     After the above identified projected ticket sales volume was communicated to TMS by BLU, COUNTRYLIFE, RHINEHART and/or NELSON, Defendants, individually and/or collectively knew the supplied information was inaccurate, because actual ticket sales were lower than they stated to TMS.

38.     Defendants RHINEHART, NELSON and/or MALONEY, individually and collectively, by and through BLU, promoted the 2015 Country Life Music Festival.

39.     Defendants RHINEHART, NELSON and/or MALONEY, individually and collectively, by and through COUNTRYLIFE, promoted the 2015 Country Life Music Festival.

40.    Defendants RHINEHART, NELSON and/or MALONEY, individually and collectively by and through BLU and/or COUNTRYLIFE, indicated that the following artists (among others) would be performing at the 2015 Country Life Music Festival:  Lynyrd Skynyrd, Keith Urban, Toby Keith, Travis Tritt, Joe Nichols, Sawyer Brown, Craig Wayne Boyd, Charlie Worsham, Joe Diffie, and RaeLynn.

41.    Defendants RHINEHART, NELSON and/or MALONEY individually and/or collectively promoted the 2015 Country Life Music Festival through a website known as http://www.countrylifemusicfestival.com/.

42.    Defendants RHINEHART, NELSON and/or MALONEY individually and/or collectively promoted the 2015 Country Life Music Festival through Facebook at https://www.facebook.com/countrylifemusicfestival.

43.    On information and belief, Defendant RHINEHART posted updates on the Facebook page for the purposes of promoting the 2015 Country Life Music Festival.

44.    On information and belief, Defendant NELSON posted updates on the Facebook page for the purposes of promoting the 2015 Country Life Music Festival.

45.    Defendant MALONEY posted updates on the Facebook page for the purposes of promoting the 2015 Country Life Music Festival.

46.    On or about April 28, 2015, the Country Life Music Festival Facebook page was updated to state:

> Get ready.... ILLINOIS BIGGEST COUNTRY FESTIVAL OF THE YEAR IS ONLY A FEW MONTHS AWAY...!!    JULY    17-19,    2015
> 25 Artists--2 Stages-- Camping Available-- Single & 3 Day Tickets

47.     On or about April 28, 2015, the Country Life Music Festival Facebook page was updated to include the following image:



48.     On or about April 29, 2015, the Country Life Music Festival Facebook page was updated by one of the Defendants to state:

> Hey Illinois...We are Very Proud to be named one of the "BEST" Country Music Festivals of the Year to attend!! Don't Miss this event..

July 17-19, Chillicothe, IL. This event is almost SOLD OUT! Info/Tickets... www.countrylifemusicfestival.com

49.     The above quoted statement was posted with the knowledge and/or permission of Defendants RHINEHART, NELSON and/or MALONEY.

50.     The above quoted statement was false when it was posted because the 2015 Country Life Music Festival was not "almost sold out" at the time of the posting.

51.     The falsity of this statement was known to RHINEHART, NELSON and/or MALONEY when it was posted on Facebook at the direction of RHINEHART, NELSON and/or MALONEY on or about April 29, 2015.

52.     At the times where the above quoted information was posted on Facebook, the 2015 Country Life Music Festival was not close to selling out as reported by RHINEHART, NELSON and/or MALONEY

53.     On or about May 1, 2015, the Country Life Music Festival Facebook page was updated to by  one of the Defendants to state: "Less than 1500 Seats remain...."

54.     The above quoted statement was posted with the knowledge and/or permission of Defendants RHINEHART, NELSON and/or MALONEY.

55.     The above quoted statement was false when it was made because more than 1,500 seats remained unsold at that time.

56.     The falsity of this statement was known to RHINEHART, NELSON and/or MALONEY when it was posted on Facebook at the direction of RHINEHART, NELSON and/or MALONEY on or about May 1, 2015.

57.     At the times where the above quoted information was posted on Facebook, the 2015 more than 1,500 seats remained unsold.

58.     As a result of low ticket sales, Defendants, individually and/or collectively, knew, in late 2014 and/or early 2015, that the low ticket sales jeopardized the viability of the 2015 Countrylife Music Festival.

59.     Despite having this knowledge, Defendants, individually and/or collectively, caused the above mentioned artists to enter into performance contracts and that the contracts required the provision of deposit payments.

60.     Defendants, individually and/or collectively, knew that advanced ticket sales were the primary source of revenue to pay for artists deposits.

61.     Defendants, individually and/or collectively, also knew that the failure to sell enough tickets advanced tickets would place them in default with the artists which would then lead to the cancellation of the 2015 Countrylife Music Festival.

62.     Despite knowing that advanced ticket sales were low, and that advanced ticket sales would be unable to pay for the artist depositions, Defendants, individually and/or collectively, authorized the booking of the artists identified above.

63.     BLU, COUNTRYLIFE and/or MALONEY were required by various contracts to pay deposits for the artists who were scheduled to perform at the 2015 Country Life Music Festival.

64.     Although BLU and/or COUNTRYLIFE paid for certain artist deposits, in late 2014 and/or early 2015, Defendants, individually and/or collectively, knew that there

were not enough advanced ticket sales to pay the remaining artists' deposits for the 2015 Country Life Music Festival.

65.     Additionally, in late 2014 and/or early 2015, Defendants, individually and/or collectively, knew that they did not have enough funds to pay artists who were scheduled to perform at another country music festival which they promoted and put on in Punta Gorda, Florida in February of 2015.

66.     As ticket sales came in for the 2015 Country Life Music Festival, Defendants, individually and/or collectively, used those funds to pay artists deposits and remaining performance day fees owed to artists for the country music festival which took place in Punta Gorda, Florida in February of 2015.

67.     By late 2014 and/or early 2015, Defendants, individually and/or collectively, knew that lower than projected ticket sales combined with the deposit payments artists to would require them to cancel the 2015 Country Life Music Festival, which would trigger ticket purchasers to seek refunds, and these refund requests would lead to "Chargebacks" being directly reimbursed by TMS.

68.     At that time, Defendants, BLU, COUNTRYLIFE, RHINEHART and NELSON, individually and/or collectively, also knew that they were required to reimburse TMS for any "Chargebacks."

69.     Despite knowing that they were required to reimburse TMS for any "Chargebacks", BLU, COUNTRYLIFE, RHINEHART and NELSON, individually and/or collectively, also knew that they did not keep sufficient funds on reserve to

reimburse TMS for any "Chargebacks", and knew that TMS would suffer hundreds of thousands of dollars in the form of unreimbursed "Chargebacks."

70.     On information and belief, Defendants fraudulently converted and/or conveyed the funds received from TMS instead of setting aside the funds to cover "Chargebacks"

71.     Despite having knowledge of these facts, Defendants, individually and/or collectively, did not inform TMS that (a) low ticket sales jeopardized the viability of the 2015 Country Life Music Festival and (b) that Defendants failed to set aside sufficient funds to reimburse TMS in the event the 2015 Country Life Music Festival was cancelled and TMS was required to issue "Chargebacks."

72.     Further, in early 2015, Defendants, individually and/or collectively, learned that they would be unable to meet the artist deposit deadlines for the 2015 Country Life Music Festival in Chillicothe, Illinois, because ticket sales for the 2015 Country Life Music Festival were being used to pay vendors and/or artists related to the Punta Gordo, Florida concert.

73.     Despite knowing that they would be unable to meet the artist deposit deadlines for the 2015 Country Life Music Festival, Defendants, individually and/or collectively, conspired and schemed to continue to promote the 2015 Country Life Music Festival, continued to sell tickets to the 2015 Country Life Music Festival and continued to utilize TMS to process credit card payments.

74.     Defendants, individually and/or collectively, conspired and schemed to promote the 2015 Country Life Music Festival, continued to sell tickets to the 2015

Country Life Music Festival and continued to utilize TMS to process credit card payments with the intention of causing TMS to reimburse consumers after the 2015 Country Life Music Festival was cancelled.

75.     Defendants, individually and/or collectively, conspired and schemed to take the above actions with the intention of never reimbursing TMS for the hundreds of thousands of dollars in "Chargebacks" that Defendants certainly knew TMS would be required to process as a result of the cancellation of the 2015 Country Life Music Festival.

76.     In particular, Defendants, individually and/or collectively, never set aside sufficient reserve funds to cover the cost of reimbursing ticket purchasers in the event that the 2015 Country Life Music Festival was cancelled.

77.     Without providing any advanced notice to TMS, on or about June 9, 2015, Defendants, individually and/or collectively, cancelled the 2015 Country Life Music Festival.

78.     As a result of the cancelled 2015 Country Life Music Festival, TMS has refunded the costs of thousands of concert tickets through "Chargebacks."

79.     Despite numerous requests, Defendants, individually and/or collectively, have refused to reimburse TMS for the "Chargebacks" that TMS has incurred as a result of the cancellation of the 2015 Country Life Music Festival.

## COUNT I – BREACH OF CONTRACT AGAINST COUNTRYLIFE, BLU, RHINEHART & NELSON

80.     TMS incorporates paragraphs 1-79 as if fully set out herein.

81.     Defendants COUNTRYLIFE, BLU, RHINEHART and NELSON contracted with TMS to process credit card payments in relation to the 2015 Country Life Music Festival.

82.     COUNTRYLIFE, BLU, RHINEHART and NELSON agreed to be bound by the terms of "Merchant Credit Card Processing Agreement."

83.     Under the terms of the "Merchant Credit Card Processing Agreement," TMS was defined as a "Servicer."

84.     Further, under the terms of the "Merchant Credit Card Processing Agreement," COUNTRYLIFE and BLU were defined as "Merchants" and RHINEHART and NELSON were also defined as "Guarantors."

85.     Under the terms of the " Merchant Credit Card Processing Application and Agreement", Defendants RHINEHART and NELSON agreed to be bound by the following as "Guarantors":

> As a primary inducement to Servicers to enter into the Merchant Agreement, the undersigned Guarantor(s), by signing below, jointly and severally, unconditionally and irrevocably, personally guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to Servicers under the Merchant Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and Servicers, as such agreements now exist or are amended from time to time, with or without notice. Guarantor(s) understands further that Servicers may proceed directly against Guarantor(s) without first exhausting their remedies against any other person or entity responsible to them or any security held by Servicers or Merchant. This guarantee will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Servicers. Guarantor(s) understand that the inducement to Servicers to enter into the Merchant Agreement is consideration for this guaranty, and that this guaranty remains in full force and effect even if Guarantor(s) receive no additional benefit from this guaranty.

86.     In relation to the Section 1.3 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU,

RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed to abide and be bound by the following terms:

> (a)     All information contained in the Merchant Application or any other documents delivered to or on behalf of Servicers in connection therewith is true and complete and accurately reflects Merchant's business, financial condition and principal partners, owners or officers.

> * * *

> (e)     There is no action, suit or proceeding at law or in equity now pending or to Merchant's knowledge, threatened by or against or affecting Merchant which would substantially impair its right to carry on its business as now conducted or adversely affect its financial condition or operations.

87.     In relation to the Section 1.4 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU, RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed abide and be bound by the following terms:

> (c)     Merchant must notify Servicers in writing of any changes to the information in the Merchant Application, including but not limited to a material change to Merchant's financial condition (within three (3) days of such occurrence), any additional location or new business, a change in the business location or contact information, both physical and email addresses, the identity of principals and/or owners, the form of business organization, type of goods and services provided, and how sales are completed. Merchant must also notify Servicers in writing if Merchant sells or closes its business. Except for a change to the financial condition, all such notices must be received by Servicers seven (7) days before the change.  Merchant will also provide updated information to Servicers upon request.

> (d)     Merchant must immediately notify Servicers in writing if Merchant is threatened with or becomes party to any action, suit or proceeding at law or in equity that could substantially impair its right to carry on its business or adversely affect its financial condition or operations.

88.     In relation to the Section 1.7 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU, RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed to abide and be bound by the following terms:

(a)      Merchant will establish and maintain an Account at a depository institution approved by Servicers. Merchant will maintain sufficient funds in the Account to satisfy all obligations, including the fees, Chargebacks and returns contemplated by this Agreement. Merchant irrevocably authorizes Servicers to debit the Account for fees, Chargebacks, returns, fines and any other penalties or amounts owed under this Agreement. In the event the Account lacks sufficient funds, Merchant and Guarantors authorize Servicers, without notice, to debit any bank account in their name(s) or the name of any affiliated entity. Merchant must obtain prior consent from Servicers to change the Account.  If Merchant does not obtain such consent, Servicers may immediately terminate this Agreement and may take other action necessary to protect their interests.

* * *

(e)      If the Account is closed or is otherwise unavailable to Servicers for ACH debit, Merchant consents to Servicers locating additional deposit accounts or assets by using any means legally available.  In this event, Merchant waives all rights to their privacy in favor of Servicers until such time as all unpaid Chargebacks and fees owed to Servicers have been paid in full.

89.      In relation to the Section 1.10 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU, RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed and be bound by the following terms:

To secure Merchant's and Guarantor's respective performance under this Agreement, including without limitation Merchant's obligations arising out of Chargebacks or returns, Merchant and Guarantor each hereby grants to Servicers, pursuant to the Uniform Commercial Code of the State of California, as amended from time to time , a security interest in all of Merchant's and Guarantor's personal assets and property, including but not limited to the following assets and property: (a) the electronic terminal, printer, imprinter and imprinter plate; (b) all Sales Drafts, ACH deposits, credit drafts, and in all Accounts and Reserve Accounts, regardless of source, wherever found, standing in the name of Merchant and/or Guarantor, whether established or designated and maintained pursuant to this Agreement or not; and (c) the proceeds and products of such assets and property. In the event of Merchant's default under this Agreement, Merchant and Guarantor(s) stipulate: (i) that all personal accounts standing in their names shall be subject to this Agreement and ACH debit; and (ii) all ACH debits, whether made against the Account or Guarantor's personal account, shall bear a commercial account code designation (CCD) for purposes of electronic collection via the ACH system, and (iii) Merchant and/or Guarantor irrevocably consent to Servicers using any means available to locate such deposit accounts until such time as all amounts due have been paid. Servicers may enforce this security interest as applicable by:

(a)      Making an immediate debit/charge via the ACH system to any deposit account standing in the name or names of Merchant and/or Guarantor, without notice or demand of any kind; and/or interrupting the electronic transmission of funds to any account through the Automated Clearing House (ACH) system;

(b)      Freezing the entire Account and/or Reserve Account, without notice or demand of any kind, upon Servicers determination that Merchant has breached any term of this Agreement;

(c)      Taking possession of any or all of Merchant's or Guarantor's personal assets or property;

(d)      Placing a receiver within Merchant's place of business without notice or bond to intercept and collect all income derived from Merchant's operations until such time as any indebtedness owed to Servicers arising under this Agreement has been satisfied in

full;as any indebtedness owed to Servicers arising under this Agreement has been satisfied in full;

(e)  By obtaining either a writ of attachment or a writ of possession without bond pertaining to Merchant's and/or Guarantor's personal assets or property.

* * *

90.  In relation to the Section 1.14 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU, RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed that TMS would charge them $20.00 for each "chargeback."

91.  In relation to the Section 1.20 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU, RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed and be bound by the following terms:

Merchant agrees to indemnify and hold harmless Servicers, and their affiliates, employees, agents, representatives, members, or stockholders, from and against any and all claims, actions, proceedings, and suits and all related liabilities, damages, settlements, penalties, fines, costs or expenses (including reasonable attorneys' fees and other litigation expenses) arising out of or relating to:

(a)  any dispute between Merchant and a Cardholder or check writer or customer, or any Sales Draft or ACH deposit paid for by Servicers;

(b)  any actual or alleged action or omission by Merchant that would constitute a breach of any representation, warranty, or obligation of Merchant set forth in this Agreement;

(c)  any damage or loss caused by negligence, fraud, dishonesty or willful misconduct by Merchant or any of its employees, agents or customers;

(d)  the reliability, accuracy, or legitimacy of payment data submitted by Merchant;

(e)  any alleged infringement of another party's intellectual property rights by Merchant;

(f)  a failure of Merchant to maintain the confidentiality of Cardholder or check writer information;

(g)  any action Servicers take against the Account under this Agreement. Merchant will also indemnify and hold harmless the institution at which Merchant maintains the Account for acting in accordance with any instruction from Servicers regarding the Account; or

(h)      any Chargebacks or fees, fines or penalties assessed by a Card Association with respect to transactions submitted by Merchant to Servicers.

If Merchant is an agency or instrumentality of a state of the United States and is precluded by the law of Merchant's state from entering into indemnification obligations, then the obligations under this Section shall apply only to the extent permitted by such state law. This section will survive termination of this Agreement.

92.      In relation to the Section 2.2 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU, RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed to abide and be bound by the following warranty terms:

Merchant hereby represents and warrants to Servicers at the time of execution and during the term of this Agreement that:

(a) Each Sales Draft presented to Servicers for collection is genuine and is not the result of any fraudulent or illegal transaction and is not being deposited on behalf of any business other than Merchant. Further, Merchant warrants that each Sales Draft is the result of a Card transaction for the bona fide purchase of goods or services by the Cardholder in the total amount stated on the Sales Draft.

(b) Merchant has performed or will perform all of its obligations to the Cardholder in connection with the Card transaction evidenced thereby.

* * *

93.      In relation to the Section 2.26 of the Merchant Credit Card Processing Agreements entered into between TMS on one side, and COUNTRYLIFE, BLU, RHINEHART and NELSON on the other, COUNTRYLIFE, BLU, RHINEHART and NELSON agreed to abide and be bound by the following terms:

All Chargebacks are due upon presentation to Merchant. In the case of a failure to pay a Chargeback upon such presentment, in addition to any other remedies which may be exercised by Servicers, Merchant agrees to pay a late charge of one and one half percent (1.5%) per month or portion thereof, or the highest amount allowable by law, whichever is less, on all unpaid Chargebacks. Servicers are authorized to deduct the amount of any Chargebacks and fees from any settlement amounts due to Merchant or from the Reserve Account, if any, or collect by any other means, including by debit to Account. Merchant acknowledges and agrees that it is bound by the Rules with respect to any Chargeback. Merchant further acknowledges that it is solely responsible for providing Servicers with any available information to re-present a Chargeback and that, regardless of any information it provides or does not provide Servicers in connection with a Chargeback, or any other reason, Merchant shall be solely responsible for the liability related to such Chargeback. Merchant understands and agrees that Card transactions are subject to

18

Chargeback for a variety of reasons under the Rules, or if Merchant has breached this Agreement, including without limitation, for the following reasons:

(e)      The Cardholder alleges that he or she did not participate in the sale, authorize the use of the Card, receive goods or services purchased, or receive a required credit adjustment, or disputes the quality of the goods or services purchased.

\* \* \*

(h)      Servicers reasonably believe in their discretion that Merchant has violated any provision of this Agreement.

(i)      Servicers reasonably determine that the Card transaction is not bona fide or is subject to any claim of illegality, cancellation, rescission, or offset for any reason whatsoever, including without limitation, negligence, fraud or dishonesty on the part of Merchant or Merchant's agents or employees.

\* \* \*

94.    COUNTRYLIFE, BLU, RHINEHART and/or NELSON breached the above terms of the Merchant Credit Card Processing Agreements that they entered into with TMS by providing false or misleading information to TMS and/or failing to timely update TMS with revised information in violation of Section 1.3(a), 1.3(e) and 1.4(c).

95.    In particular, BLU and RHINEHART violated Section 1.4(d) by failing to inform TMS of the fact that they had been sued by PAAR Investments, LLC in the Circuit Court of the Eleventh Circuit of the County of McLean, Illinois, for the failure to honor certain contractual commitments relative to a 2014 concert where the proposed judgment exceeded $210,000.

96.    Further, COUNTRYLIFE, BLU, RHINEHART and/or NELSON breached the above terms of the Merchant Credit Card Processing Agreements that they entered into with TMS by failing to comply with Section 1.7(a) in that these Defendants did not establish and maintain sufficient funds to satisfy, among other things, "Chargebacks" associated with the cancelled 2015 Country Life Music Festival.

97.     COUNTRYLIFE, BLU, RHINEHART and/or NELSON also breached Section 2.2(a) of the Merchant Credit Card Processing Agreements by procuring and presenting fraudulent and illegal ticket transactions to the extent that these Defendants knew that they would be required to cancel the 2015 Country Life Music Festival at the time that they were procuring and presenting transactions from consumers and passing on these transactions to TMS.

98.     COUNTRYLIFE, BLU, RHINEHART and/or NELSON also breached Section 2.2(a) of the Merchant Credit Card Processing Agreements by procuring and presenting transactions which did not constitute the "bona fide purchase of goods or services" because these Defendants knew, at the time that they processed the ticket sales, that they would be required to cancel the 2015 Country Life Music Festival at the time that they were procuring and presenting transactions from consumers and passing on these transactions to TMS.

99.     COUNTRYLIFE, BLU, RHINEHART and/or NELSON also breached Section 2.2(b) of the Merchant Credit Card Processing Agreements by procuring and presenting fraudulent and illegal ticket transactions because these Defendants knew, at the time that they processed the ticket sales, that they would not "perform all of its obligations to the Cardholder in connection with the Card transaction."

100.    COUNTRYLIFE, BLU, RHINEHART and/or NELSON also breached the above terms of the Merchant Credit Card Processing Agreements that they entered into with TMS by failing to comply with Section 2.26 in that these Defendants have not

reimbursed TMS for "Chargebacks" and/or paid TMS any late charges associated with processed "Chargebacks" processed and paid by TMS.

101.    Additionally, COUNTRYLIFE, BLU, RHINEHART and NELSON breached the terms of the Merchant Credit Card Processing Agreements by continuing to promote the 2015 Country Life Music Festival and sell tickets after they learned that they would be unable to put on the 2015 Country Life Music Festival after sales figures were lower than projected and actual ticket sales required COUNTRYLIFE, BLU, RHINEHART, NELSON and/or MALONEY to use ticket sales for the 2015 (Illinois) Country Life Music Festival to pay the artists who performed at earlier Country Life Music Festival which took place in February of 2015 in Punta Gorda, Florida.

102.    COUNTRYLIFE, BLU, RHINEHART and NELSON breached the terms of the Merchant Credit Card Processing Agreements by refusing to inform TMS in a timely manner that the 2015 Country Life Music Festival they would be unable to put on the 2015 Country Life Music Festival for the reasons set forth in the preceding paragraph.

WHEREFORE, TMS respectfully requests this Court enter judgment in TMS's favor, for damages in excess of $75,000, plus punitive damages, costs and pre-judgment interest and otherwise require Defendants to reimburse TMS for the ticket refunds and "Chargebacks" in accordance with the terms of the Merchant Credit Card Processing Agreements.

**COUNT II – COMMON LAW FRAUD –AGAINST ALL DEFENDANTS**

103.    TMS incorporates paragraphs 1-79 as if fully set out herein.

104.    Defendants, individually and collectively, continued to promote the 2015 Country Life Music Festival and sell tickets despite knowing that they would be unable to put on the 2015 Country Life Music Festival after low ticket sales figures for the Florida Country Life Music Festival (which took place in February of 2015 in Punta Gorda, Florida) required Defendants to use ticket sales for the Illinois-based 2015 Country Life Music Festival to pay the artists who performed at the Florida Country Life Music Festival.

105.    By utilizing funds from the ticket sales from the for the Illinois-based 2015 Country Life Music Festival to pay the artists who performed at the Florida concert, Defendants knew that there would not be enough revenue from ticket sales for the Illinois-based 2015 Country Life Music Festival to pay for the deposits for the artists scheduled to perform at the Illinois-based 2015 Country Life Music Festival.

106.    DEFENDANTS' misconduct and misrepresentations as set forth in the proceeding paragraphs constitute material misrepresentations.

107.    DEFENDANTS' misconduct and misrepresentations were material to TMS's decision to provide and continue to provide them with access to the credit card processing services.

108.    DEFENDANTS knew at the time they made the above representations that the representations were false and misleading.

109.    DEFENDANTS made above misrepresentations with the intent to wrongfully induce TMS to provide them with the credit card processing services.

110.    TMS was justified in relying upon the statements made by DEFENDANTS.

111.    DEFENDANTS' conduct was willful and wanton to the extent that actively concealed the fact that ticket sales were not on pace to allow them to pay the necessary artist deposits, thus jeopardizing the ability to have the 2015 Country Life Music Festival take place.

112.    Despite knowing this fact, DEFENDANTS continued to accept money from consumers for tickets, despite knowing that the ticket sales would never allow them to stage the 2015 Country Life Music Festival.

113.    TMS sustained damages as a direct and proximate result of the misconduct DEFENDANTS and TMS's reliance on the misstatements of DEFENDANTS.

WHEREFORE, TMS respectfully requests this Court enter judgment in TMS's favor, for damages in excess of $75,000, plus punitive damages, costs and pre-judgment interest and any other further relief to benefit TMS as warranted under the facts of this case.

## COUNT III – ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES

## ACT CLAIM AGAINST ALL DEFENDANTS

114.     TMS incorporates paragraphs 1-79 and paragraphs 103-113 as if fully set out herein.

115.     In relevant part, the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") provides in part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby . . . .

815 ILCS 505/2.

116.     As set forth above, Defendants' actions, individually, and collectively, constitute unfair and deceptive acts within the meaning of and in violation of Section 505/2 of the ICFA.

117.     Defendants' unfair and deceptive acts occurred in a course of conduct involving trade and commerce, mainly the promotion and sale of tickets for the 2015 Country Life Music Festival.

118.     Defendants' actions were willful and deliberate.

119.     Defendants committed the foregoing act with the intent that Plaintiff and consumers would act upon their unfair and deceptive acts.

120.    Plaintiff relied on Defendants' misrepresentations in allowing Defendants' to utilize Plaintiff's credit card processing services to process concert ticket sales for the 2015 Country Life Music Festival.

121.    A consumer nexus exists because consumers relied on Defendants' misrepresentations when the purchased concert tickets.

122.    Plaintiff was damaged by Defendants' unfair and deceptive acts to the extent Plaintiff has been required to refund ticket purchased by consumers.

123.    Additionally, consumers have been injured by Defendants' unfair and deceptive acts to the extent that they have incurred non-refundable travel costs. Additionally, some consumers who purchased tickets through debit cards may not have received refunds from their banks.

WHEREFORE, TMS respectfully requests this Court declare that Defendants violated the ICFA and enter judgment in TMS's favor, for damages in excess of $75,000, plus punitive damages, costs and pre-judgment interest and any other further relief to benefit TMS as warranted under the facts of this case.

## COUNT IV – UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

124.    TMS incorporates paragraphs 1-79 and paragraphs 107-123 as if fully set out herein.

125.    Alternatively, Defendants unjustly retained the benefit to TMS's credit card processing services to the extent Defendants misuse of TMS's credit card processing services and received hundreds of thousands of dollars.

126.    Defendants' above stated misconduct was and is detrimental to TMS to the extent it has caused TMS to process hundreds of thousands of dollars of refunds and "charge backs" to consumers who purchased tickets for the 2015 Country Life Music Festival.

127.    Defendants' retention of the benefits resulting from to TMS's credit card processing services.

128.    Defendants have refused to reimburse TMS for the hundreds of thousands of dollars that Defendants received from the above stated misconduct.

129.    Defendants' retention of the benefits resulting from to TMS's credit card processing services is unjust violates the principles of justice, equity, and good conscience in the absence of any reimbursement to TMS of the ticket sales wrongfully received by Defendants.

WHEREFORE, TMS, respectfully requests this Court to find that:

(a)    Defendants unjustly retained the benefit to Plaintiff's credit card processing services;

(b)    Defendants' above stated misconduct was and is detrimental to Plaintiff;

(c)    Defendants' retention of the benefits resulting from to Plaintiff's credit card processing services violates the principles of justice, equity, and good conscience;

(d)    Defendants should be required to reimburse Plaintiff for all refunds and "charge backs" that Plaintiff has and will continue to process; and

(e)    Any other further relief to benefit TMS as warranted under the facts of this case.

## COUNT V – QUANTUM MERUIT AGAINST ALL DEFENDANTS

130.    TMS incorporates paragraphs 1-79 and paragraphs 107-129 as if fully set out herein.

131.    Alternatively, TMS provided a benefit to Defendants through the provision of TMS's credit card process services in relation to Defendants' sale of tickets for the 2015 Country Life Music Festival.

132.    Defendants' retention of the benefits resulting from to TMS's credit card processing services is unjust violates the principles of justice, equity, and good conscience in the absence of any reimbursement to TMS of the ticket sales wrongfully received by Defendants.

133.    Defendants have refused to reimburse TMS for the hundreds of thousands of dollars that Defendants received from the above stated misconduct.

WHEREFORE, TMS, respectfully requests this Court to find that:

(a)    Defendants unjustly retained the benefit to Plaintiff's credit card processing services;

(b)    Defendants' above stated misconduct was and is detrimental to Plaintiff;

(c)    Defendants' retention of the benefits resulting from to Plaintiff's credit card processing services violates the principles of justice, equity, and good conscience; and

(d)    Defendants should be required to reimburse Plaintiff for all refunds and "charge backs" that Plaintiff has and will continue to process; and

(e)    Any other further relief to benefit TMS as warranted under the facts of this case.

Respectfully submitted,

/s/ James C. Vlahakis

Attorneys for Plaintiff, TOTAL
MERCHANT SERVICES, INC.

HINSHAW & CULBERTSON, LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois  60601
Telephone:  (312) 704-3000
FAX:  (312)704-3001
jvlahakis@hinshawlaw.com